## Joseph Torre et al. *v.* Marie L. Jeanin et al.

1. Names. *Idem sonans.*

　　The court declines to say under the evidence whether the names "Fayard" and "Fasiar" are *idem sonans*, as written and pronounced in the old French, used by the early settlers on our seacoast.

2. Same. *Deeds. Identity of person.*

　　If the identity of the person of a grantee with one under whom plaintiff's claim title be fully established, the question of identity of sound and orthography in the names used or given such person becomes unimportant.

3. Alienage. *Presumption. Evidence. Ejectment.*

　　The law will not presume the alienage of a party under whom a plaintiff in ejectment claims, but evidence of alienage must be clear and satisfactory.

4. Boundaries. *Controversies. Evidence. Hearsay.*

　　Hearsay evidence is admissible in controversies concerning ancient boundaries.

5. APPELLATE PRACTICE.   *Harmless error.*

    Errors in the admission or rejection of evidence are insufficient to warrant a reversal where the judgment appealed from is manifestly correct.

FROM the circuit court of Harrison county.

HON. THADDEUS A. WOOD, Judge.

This case was an action of ejectment wherein Marie L. Jeanin and others, appellees, were the plaintiffs in the court below, and the appellants, Joseph Torre and others, were the defendants there.   The judgment in the trial court was in favor of the plaintiffs and defendants appealed to the supreme court.   The facts are sufficiently stated in, or are clearly inferable from, the opinion of the court.

*Frank Johnson* and *J. I. Ford*, for appellants.

1. The ruling of the circuit court in permitting the introduction of the patent to Louis Fasiar, and evidence that the plaintiffs actually claimed under one Louis Fayard, was erroneous, and improper.   The names are not *idem sonans*.   The spelling is not only entirely different, but the pronunciation of the two names is widely different.   One is pronounced Faziar, and the other Fiar.   The rule is thus stated in the text of the American and English Encyclopedia of Law: "That absolute accuracy in spelling names is not required in legal documents or proceedings, either civil or criminal; that if the name as spelled in the document, though different from the correct spelling thereof, conveys to the ear, when pronounced according to commonly accepted methods, a sound practically identical with the sound of the correct name as commonly pronounced, the name as thus given is a sufficient designation of the individual refered to, and no advantage can be taken of the clerical error.   16 Am. & Eng. Enc. L., 122.   It is not a case, therefore of *idem sonans*, and the testimony should have been excluded.

2. The court should, in any view of this question, have sub-

mitted it to the jury to be passed upon. "The question whether or not two or more names are *idem sonans* may, on a plea in abatement or special demurrer, be determined by the court upon a mere comparison, where the issue is free from doubt, as if the words necessarily do or do not sound alike; but the modern and approved practice is to submit the question to the jury whenever there is an opportunity to do so, and where the correct sound appears at all doubtful or dependent upon particular circumstances." 16 Am. & Eng. Enc. L., 126; *Commonwealth* v. *Donovan*, 95 Mass., 57; *Commonwealth* v. *Jennings*, 121 Mass., 47; *Commonwealth* v. *Warren*, 143 Mass., 568; *Weitzel* v. *State*, 28 Texas App., 523; *Taylor* v. *Commonwealth*, 20 Gratt. (Va.), 828. An instruction was asked by the defendants, presenting this issue to the jury, which was refused by the court.

3. White, a witness for the plaintiff, gave his testimony on the witness stand in regard to the contents of deeds and records which were not introduced in evidence. He stated the result of his investigation of the deed books and records, and testified also what boundary lines had been recognized by the parties to the partition proceedings. All of which was objected to by the defendants. One of the important issues in the case was the actual location of lot 2, and White's statements as to the results of his examination of records, as showing the location of the land in controversy, were clearly incompetent. It was equally incompetent for him to testify in regard to what was shown by the various deeds referred to by him.

4. The plaintiffs claim title through one J. B. Jeanin, who was a subject of France, and who died in New Orleans, La., in September, 1863. Under the statute of the state in force at the time, only resident aliens residing in this state could acquire and hold real estate. Revised code 1857, § 9, art. 65, p. 320. By article 66, the lands of aliens residing in the state, after being naturalized, descended to their heirs at law (revised code

1857, § 9, art. 66, p. 320); but, if an alien died, who was a resident of the state, without being naturalized, his estate went, by escheat, to the state. Under these statutes a nonresident alien could not acquire or hold lands nor transmit lands by descent.

At common law, "when an alien, seized of real estate, dies intestate, as he has no inheritable blood, he can have no legal heirs, and so cannot transmit the estate by descent, and, as the law will not deem it to be in abeyance, except in case of absolute necessity, it vests immediately in the state, without office found." 2 Am. & Eng. Enc. Law (2d ed.), 74, and note 1. "So also alienage in any mediate ancestor will interrupt the descent between persons who are capable of taking and transmitting real estate by descent." 2 Am. & Eng. Enc. Law (2d ed.), 75, note 1.

Upon construction of the statutes cited, *supra*, only resident aliens were capable of acquiring property (real estate) in this state, and they had no inheritable blood until they were naturalized. In this case J. B. Jeanin could not have acquired the property, nor could he transmit it by descent. The evidence makes a *prima facie* case that J. B. Jeanin was a nonresident alien.

In the absence of any evidence on the subject, it cannot possibly be presumed that J. B. Jeanin was a naturalized citizen, the only evidence being that he was a subject of France. This point was made by a motion to exclude the plaintiffs' testimony, which was overruled by the court, and it was presented also by an instruction asked by the defendants, and which was refused by the court.

5. The report of the survey of the premises made under an order of court by Uriel Wright, the county surveyor, was improperly excluded by the court. The objection was that it was made without notice. But it appeared that it was made by an agreement of Bowers and White, who were at that time the attorneys for the plaintiffs. The court also re-

fused to allow this witness to refresh his memory by referring to the original field notes made at the time of the survey. The report of the survey was not sworn to, but, when offered in evidence, the defendant's attorney proposed to have Wright make an affidavit to it.

6. The court erred in giving a peremptory instruction for the plaintiffs and in refusing the various instructions asked by the defendants.    The case should have gone to the jury on the evidence.    (1) The evidence of the plaintiffs in support of their title was far from clear and satisfactory.    It does not appear satisfactorily from the evidence that the lot claimed by the plaintiffs is the lot occupied by the defendants.    (2) The testimony of Wright and McCaughan, especially the former, shows that the land claimed by the plaintiffs is not the land claimed by the defendants.

*Denny & Woods*, and *A. Y. Harper* and *W. R. Harper*, for appellees.

A careful reading of the record will clearly show that the defendants in the court below had no solid foundation on which to base a defense.    Defendants relied solely upon technicalities and the hope that plaintiffs would fail to make out their case.    From the record it cannot be seriously or rationally contended that appellants are anything in the world but squatters and interlopers.    Where plaintiffs in an action of ejectment claim title as the heirs of an ancestor, who died in possession of the land, such possession is *prima facie* evidence of seizin in fee, and is sufficient to enable them to recover against mere intruders or any one claiming title shown to be void.    *Hicks* v. *Steigleman*, 49 Miss., 377; *Kerr* v. *Farish*, 52 Miss., 101; *Lum* v. *Reed*, 53 Miss., 73; *Johnson* v. *Futch*, 57 Miss., 73; *Dingey* v. *Paxton*, 60 Miss., 1038.

Plaintiffs proved a perfect record title from the United States government down and into themselves, and that the title of defendants was not only a sham and a fraud, but a myth as well.

That there was in early days only one man who ever pretended ownership to said land was shown most clearly. It was the same man (a Frenchman) whose name was spelled differently by different people. A sister of "Fayard" also received a patent to certain lands in Harrison county, and the same mistake was made in spelling her name. The "Angeline Fasiar" patent is mentioned in *Bernard* v. *Elder*, 50 Miss, at page 341. It is of no moment that "Fayard's" name was spelled "Fasiar." He not only could have received title as "Fasiar," but could have conveyed it by the name of "Fasiar," or any other name, if he adopted it and wrote it. Appellees were entitled under the partition proceedings to a lot bounded on the east by a certain lot, and on the west by a certain other lot—a call for natural monuments in the shape of lots—and the rule is that: "A call for natural monuments will prevail over courses and distances." *O'Herrin* v. *Brooks*, 67 Miss., 266. And parol evidence is as much admissible to prove boundary as any other fact." *Newman* v. *Foster*, 3 How. (Miss.), 390; *Gordon* v. *Kitrell*, 21 So. Rep., 922.

The character of proof made in this case was clearly competent. *Nixon* v. *Porter*, 38 Miss., 401. The location of the lots has been fixed for nearly a half century, and will not be disturbed. *Butler* v. *Vicksburg*, 17 So. Rep., 605. By their plea defendants below admitted possession of all that part lying south of the Pass Christian road, which reduced the question to one of title. *Campe* v. *Renandine*, 64 Miss., 441. A boundary line fixed by a surveyor estops no one from showing its incorrectness. *Watrous* v. *Morrison*, 14 So. Rep., 805.

The jury believed, as they had a right to do, plaintiffs' witnesses as to the location of said lot. "Cases may be counted by the hundreds, if not by the thousands, where contracts, deeds and wills are made effective by identification, by extrinsic evidence, of the person or subject intended, yet in no wise violate the rule that evidence cannot be admitted to contradict, add to, subtract or vary the terms of a written instrument.

*Peacher* v. *Strauss*, 47 Miss., 353.   The order partitioning the lands cannot be attacked in a collateral way.   *Harrington* v. *O'Reilly*, 9 Smed. & M., 216.

Argued orally by *Frank Johnston*, for appellants, and by *W. R. Harper*, for appellees.

WOODS, C. J., delivered the opinion of the court.

It would be hazardous for a court not familiar with the French language to undertake to settle important property rights on the sole ground that proper names of parties asserting such rights are not identical in sound and orthography with that of their ancestors, as disclosed by the patent obtained from the United States.   Whether the name Fayard has similar or identical sound with the name Fasiar, as written and pronounced in the old French, we are utterly unable to say, after looking at it in the light of the evidence in the record before us.   But this is not vital to the issue.   The identity of Louis Fayard with the person called Louis Fasiar in the patent cannot be said to be doubtful.

In the year 1793 Louis Fayard, the ancestor of him through whom the father of the appellees claim title, settled upon this land, and continued to reside upon the same until his death, about the year 1830, and his children continued to occupy and claim the land after his death.   In the year 1847 a patent was issued to Louis Fasiar, as the name is therein written, in pursuance of the provisions of an act of congress of March 3, 1819.   By the terms of a treaty between the United States and Spain, by which the territory of East and West Florida was ceded by the latter to the former, the United States undertook to respect existing private rights of property in the ceded territory.   Besides protecting private ownership under grants from the several foreign governments who had successively owned the ceded territory, the act of congress of 1819 made provision for grants of land, not exceeding six hundred and forty acres, to settlers act-

ually occupying their holdings. The claim of Louis Fayard, written Fasiar in the patent, was established to the satisfaction of the interior department, and a patent issued, after the government survey had been made, to section 26, township 7, range 9 west, the same being the land settled upon by Fayard in 1793, and continuously occupied by him until his death, and afterward by his heirs at law. In the year 1849 the lands involved in the present suit were allotted, under regular proceedings had by the heirs of Louis Fayard for that purpose in the probate court of Harrison county, to Alexis Fayard, one of the sons of said Louis Fayard, as lot 2, the other lots, 1, 3, 4, 5 and 6, falling to the several other children or descendants of said Louis Fayard, and these various allotments have stood as then made for fifty years. The entire body of the lands embraced in the patent of 1847 has always been called and known as the "Louis Fayard claim." The oldest inhabitants in that region—and one who testified was over one hundred years old when her deposition was taken—have never known or heard of any person whose family name was Fasiar, while all knew the Fayards, and one knew Louis Fayard in his lifetime, and when he was in actual occupation of the Fayard claim. The title of Louis Fayard and of his descendants and grantees has never before been challenged.

That Louis Fayard, the settler of 1793, and Louis Fasiar, the patentee from the United States, were one and the same man appears to us to be perfectly certain, and the title to the lot in controversy, derived by conveyance to appellees' father from Alexis Fayard, perfectly made out. The court below did not err in so holding, and in peremptorily instructing the jury to so find.

Whether the land described in the declaration was lot 2 was left to the jury under all the evidence. That the defendants, appellants here, were in possession of the property was admitted by their plea, and evidence offered by them to deny possession was unavailing. That they had no title derived

from some unnamed tax sale is too clear to require remark. That possession, under color of title from one Lyons, for less than ten years, did not bar plaintiffs—appellees—right of recovery is also clear. Complaint is made to the court's action in admitting and excluding evidence. That hearsay evidence is admissible in controversies over ancient boundaries seems to be well established. That some errors were committed may be conceded, but they could not have materially affected the result—the only result which could have been rightfully reached having been reached. It is argued by counsel for appellants that the purchaser of this property, the ancestor of appellees, from Alexis Fayard, was at the time of the purchase a nonresident, unnaturalized alien, and incapable of holding or transmitting by descent real estate situated in this state. Under the view which we entertain touching the ten words of evidence found in the record on this point, it will be unnecessary to consider at all the treaty of 1853 between France and the United States, by which the rights of a French alien to hold and dispose of real estate in the United States were placed on the same footing with those of citizens of this country, or to examine the decisions of the United States supreme court on this subject. The only scrap of evidence on this point is found in one question and the answer to it. One of the appellees was asked, "Of what country was your father a subject?" To which she replied, "France—Paris." The answer seems to show that the witness was giving the nativity of her father, and it was too vague and unsatisfactory to warrant the counsel's contention. There is absolutely nothing to show that the father of appellee was never naturalized during the many years of his life when he resided in this country. "An alien is one who is born out of the jurisdiction of the United States, subject to some foreign government, and who has never been naturalized under the constitution or laws of the United States, or any of them." 1 Am. & Eng. Enc. L., 456. The appellees are not to be subjected to the loss of their inheritance by evi-

dence so inconclusive and unsatisfactory. The evidence of alienage must be clear and satisfactory, and these ten words are neither clear nor satisfactory proof of the facts that the father was a subject of France, and that he died without ever having been naturalized.

*Affirmed.*